UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KRISTA JONES,

        Plaintiff,

v.

INTERLAKE STEAMSHIP
COMPANY, et al.,

        Defendants.
_____/

Case No. 2:19-cv-00255

Hon. Robert J. Jonker
U.S. District Judge

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation ("R&R") addresses the motion for summary judgment filed by the remaining defendant – Marine Engineers' Beneficial Association ("MEBA").  (ECF No. 167.)

In May 2019, Plaintiff Krista Jones worked for Interlake Steamship Company ("Interlake") as Chief Steward onboard the Motor Vessel *Stewart J. Cort* ("*Cort*").[1]  On May 29, 2019, Jones missed the *Cort*'s departure from Superior, Wisconsin.  The next day, she was fired.

At the time of her termination, Jones was a member of a union: Defendant Marine Engineers' Beneficial Association.  The terms of her employment were governed by a 2013 collective bargaining agreement ("CBA") between Interlake and

---

[1]  Jones says that she was hired by Interlake in December 2011 as a cook, was promoted to relief steward in 2014, and then became the "permanent steward" (Chief Steward) in March of 2018.  (ECF No. 28, PageID.97-98.)

MEBA and by a 2013 side letter agreement. The agreements covered Licensed Mates, Chief Engineers, Assistant Engineers, Masters, and Chief Stewards. The CBA required Interlake to provide "just cause" to terminate members of MEBA, but the side letter agreement excluded Chief Stewards and Masters from this provision.[2]

Jones sued Interlake and MEBA for violations of labor laws. Specifically, Jones alleged (1) a hybrid Section 301 claim against both Defendants, asserting first that Interlake breached the CBA by terminating Jones without just cause, and second that MEBA violated its duty of fair representation by failing to adequately represent Jones in a grievance against Interlake, (2) a claim against MEBA, asserting that MEBA also breached its duty of fair representation by negotiating the 2013 side letter agreement that excluded Chief Stewards from many of the protections of the CBA, (3) a claim that MEBA violated Jones's right to a copy of her CBA under 29 U.S.C. § 414 by making her pay $25 for a copy, and (4) claims that either or both Defendants violated unspecified state contract laws.

After Defendants filed dispositive motions (*see* ECF Nos. 32 (motion to dismiss by MEBA), 33 (motion to dismiss by Interlake), this Court granted the motions and dismissed this case. (ECF Nos. 63 (Order) and 64 (Judgment).) The Sixth Circuit reversed the dismissal in part and affirmed it in part. (ECF No. 67.) The Sixth Circuit affirmed the dismissal of Interlake because Interlake did not breach the contract by firing Jones and affirmed the dismissal of the state law claims. (*Id.*)

---

[2]     Cooks and Porters, who are supervised by the Chief Steward, belong to the Steelworkers Local 5000 union. (ECF No. 167, PageID.1460-1461 (Affidavit of former MEBA President Ronald Davis).)

The Sixth Circuit reversed the dismissal of MEBA and remanded the remaining issues against MEBA to this Court. (*Id.*)

Thereafter, the Court granted Jones's motion for summary judgment on the issue that MEBA violated 29 U.S.C. § 414 by making her pay $25 for a copy of the CBA. (ECF No. 168.) MEBA now moves for summary judgment on the remaining claims that it breached the duty of fair representation by negotiating the 2013 side letter agreement that excluded Chief Stewards from just cause termination and that MEBA failed to undertake an adequate investigation and pursue a grievance on behalf of Jones.

It is respectfully recommended that the Court grant MEBA's motion for summary judgment because no genuine issue of material fact exists to establish that MEBA acted arbitrarily, discriminately, or in bad faith by agreeing to the 2013 side letter. In addition, there exists no genuine issue of material fact which could establish that MEBA acted arbitrarily, discriminately, or in bad faith in investigating Jones's termination from Interlake and by deciding not to pursue an appeal of the termination.

### II. Factual Background

#### a. Initial 2003 negotiations between MEBA and Interlake

Initially, Interlake and the union American Maritime Officers ("AMO") had a CBA. (ECF No. 167-6, PageID.1451 (Affidavit of Interlake Senior Vice President Robert Dorn).) The CBA with AMO included coverage for Chief Stewards. (*Id.*) During the initial negotiations with MEBA, Interlake did not want Chief Stewards

or Masters included in the bargaining unit because Chief Stewards or Masters ran their departments and were considered members of senior management. (ECF No. 167-8, PageID.1460 (Affidavit of former MEBA President Ronald Davis).) MEBA, unlike AMO, did not have a roster of stewards. (*Id.*, PageID.1461.) Therefore, Interlake would have to hire and train stewards, and wanted the ability to terminate a steward free of the grievance process. (*Id.*)

Despite maintaining the position that Chief Stewards and Masters should have full contract rights, MEBA believed that this issue was a deal killer for Interlake. (ECF No. 167-9, PageID.1467 (Affidavit of former MEBA Vice President Donald Keefe).) MEBA believed that even without the just cause provision applying to Chief Stewards and Masters, their inclusion in the CBA would be beneficial due to the lucrative fringe benefits available to them from the benefit plans. (*Id.*) Therefore, MEBA agreed that if Interlake included Chief Stewards and Masters in the bargaining unit, MEBA would consent to exclude them from just cause protection and other contractual provisions.

In July of 2003, MEBA and Interlake entered into a side letter agreement that included Chief Stewards and Masters in the bargaining unit but excluded them from just cause termination and certain other provisions. (ECF No. 167-8, PageID.1461-1462.) The 2003 side letter agreement and CBA terminated in 2013.

b. **Negotiation of the 2013 Side Letter**

MEBA's president Michael Jewell met with Interlake to negotiate the new CBA. (ECF No. 167-10, PageID.1471 (Affidavit of former MEBA President Michael

Jewell).)  Interlake wanted to maintain the terms of the 2003 side agreement, because Masters and Chief Stewards still ran their departments and still were hired and trained by Interlake.  (*Id.*, PageID.1471-1472.)  Additionally, Interlake took the position that Chief Stewards directly affect morale because they were responsible for the food.  (*Id.*, PageID.1472.)  Interlake wanted to keep the power to terminate Chief Stewards without the risk that an arbitrator would order Interlake to reinstate a poor performing Chief Steward.  (*Id.*)

Jewell agreed to the 2013 side letter because he recognized the importance of keeping Chief Stewards and Masters in the bargaining unit to maintain fringe benefits including their pensions.  (*Id.*)  Jewell explained:

> [Interlake Vice President] Dorn argued that Interlake needed complete control over these classifications.  He noted that they were the heads of their departments and that being primarily a union of engineers, MEBA-D1 did not train and could not refer Masters and Chief Stewards for employment on Interlake vessels.  Interlake drew a distinction between Masters and Chief Stewards, on the one hand, and Chief Engineers on the other.  That is, although Chief Engineers headed up the engineering department, MEBA-D1 trained and could refer out Chief Engineers. . . .
>
> With respect to Chief Stewards, Interlake asserted that the number one factor that affects morale on ship is the food and, correspondingly, the Chief Steward, who is responsible for the food.  Similar to the Master, Interlake did not want to risk an arbitrator reinstating a Chief Steward that was adversely affecting morale on board its vessels, which can be away from land for days or weeks at a time.  This resonated with me, having sailed for so long.  But, by being in the bargaining unit, Chief Stewards participated in the generous benefits provided in the CBA, such as participation in the pension plan.  I was not made aware of any complaints from Masters or Chief Stewards about the contractual arrangement, which had been in place for a decade.  So, on balance, I considered the side letter presented to me, which mirrored the original from 2003, as fair and reasonable and I signed it on that basis.

(ECF No. 167-10, PageID.1472.)

The 2013 side letter agreement was the controlling agreement at the time of Jones's termination from Interlake. The side letter agreement provided:

Robert F. Dorn<br>*Senior Vice President*

November 22, 2013

Michael B. Jewell
MEBA, District No. 1-PCD (AFL-CIO)
444 North Capital Street, N. W.
Suite 800
Washington, DC 20001-1570

Dear Mike:

 It is agreed that the Company will employ a Master and a Chief Steward (Officers) on all vessels covered by the August 1, 2013 Collective Bargaining Agreement (Agreement), simultaneously executed herewith, between the Parties. It is further agreed that only Articles II Union Membership, V No Strikes/No Lockouts, VIII Family Leave Vacation Benefits, X Sailing Season Bonus, XI Transportation, XIII Continuity of Service, XVI MEBA Benefits Plans, excluding the MEBA Training Plan and XVII Effective Date & Duration shall apply. The Company shall set wages and future increases, which if any shall be effective on August 1st of each year of this Agreement, for the Officers and advise the Union of same. Article VI Grievance Procedure shall apply only to alleged violations of VIII Family Leave Vacation Benefits, X Sailing Season Bonus, XI Transportation, XIII Continuity of Service, and XVI MEBA Benefits Plans.

 Only the Daily Rates of pay for Officers, covered herein, shall be used for calculating pension benefits in accordance with the MEBA Pension Plan Rules & Regulations in effect at the time the Officer retires. No special payments, supplements, or lump sum payments shall be used in any benefit calculation or other compensation calculation.

Agreed to this 22nd Day of November, 2013.

Company:  /s/ Robert F. Dorn
Robert F. Dorn
Senior Vice President

Union:  /s/ Michael B. Jewell
Michael B. Jewell
MEBA, District No.1-PCD (AFL-CIO)

(ECF No. 32-2, PageID.178.)

Importantly, pursuant to the side letter agreement, Section VI of the CBA did not apply to Masters and Chief Stewards. Section VI of the CBA included the just-cause provision and access to the CBA's grievance and arbitration process. (*See* ECF No. 32-1, PageID.143-45 (Section VI of the CBA).)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Analysis

Jones argues that the side letter agreement's exclusion of Chief Stewards from the just cause provision and grievance procedure protections in the CBA was unfair. Jones argues that in negotiating the 2013 side letter agreement, MEBA acted

arbitrarily, discriminately, or in bad faith by agreeing to exclude Chief Stewards from these protections.[3] (ECF No. 169, PageID.1516.) Jones also argues that MEBA acted arbitrarily, discriminately, or in bad faith in investigating her termination and by not pursing a grievance on her behalf. Importantly, the Sixth Circuit decision framed the issue as "whether the union treated [Jones] arbitrarily, discriminately, or in bad faith." (ECF No. 67, PageID.510 (*citing Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).

A union violates its duty of fair representation when it is "hostile or discriminatory" towards any members, when it negotiates with employers "in bad faith," or when it fails to "avoid arbitrary conduct." *Air Line Pilots Ass'n., Intern. v. O'Neill*, 499 U.S. 65, 76 (1991). "A union breaches its duty of fair representation when its actions or omissions are arbitrary, discriminatory, or in bad faith." *DeShetler v. FCA US, LLC*, 790 F. App'x 664, 669 (6th Cir. 2019) (citing *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 538 (6th Cir. 2003)).

Most crucial to the case at hand, and the type of conduct alleged by Jones in her complaint, is whether MEBA's willingness to negotiate away an array of protections for Chief Stewards, including protection against discharge without just-cause, was the result of "arbitrary conduct." The "final product of the bargaining process" is only considered evidence of arbitrary conduct "if it can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly

---

[3] Jones alleged in her amended complaint that MEBA acted "arbitrarily and perfunctorily." (ECF No. 28, PageID.106.) Jones now indicates that a "perfunctory" analysis is not appropriate under the facts of this case. (ECF No. 169, PageID.1516.)

8

irrational." *Air Line Pilots Ass'n., Intern*, 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). Union actions are "arbitrary only when [they are] irrational, when [they are] without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). The fact that a union makes a deal that, in retrospect, is clearly a bad one, is not enough to find that the union was "irrational." *Air Line Pilots Ass'n., Intern*, 499 U.S. at 79. "The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents." *Ford Motor Co.*, 345 U.S. at 338. In general, courts give broad discretion to unions regarding the substance of their negotiations, which can often justifiably result in different protections for different classes of workers. *Id.*; *see also Bowerman v. Int'l Union Local No. 12,* 646 F.3d 360, 369 (6th Cir. 2011) (noting that "[a]s a practical matter, unions are rarely able to negotiate agreements that completely satisfy the desires of all its represented members"); *Ratkosky v. United Transp. Union,* 843 F.2d 869, 876 (6th Cir. 1988) (noting that "the fact that a seniority system in a collective bargaining agreement favors one group more than another does not in itself constitute a breach of the union's duty").

In deciding whether the union's actions were arbitrary, the Court must examine the union's decision-making process through the lens of the legal and factual context at the time of the actions in question. *Air Line Pilots Ass'n., Intern*, 499 U.S. at 79. Essentially, courts ask *why* the union made the decision that it did and only find a breach of the duty of fair representation when the answer is absurd (wholly irrational or without any explanation), hostile or discriminatory towards any

member, or otherwise demonstrates that the union acted in bad faith. *See, generally, Air Line Pilots Ass'n., Intern*, 499 U.S. 65; *Ford Motor Co.*, 345 U.S. 330; *Bowerman*, 646 F.3d 360; *Ratkosky*, 843 F.2d 869. The plaintiff carries the "demanding" burden of showing the union acted outside of its wide range of reasonableness. *Bowerman*, 843 F.2d at 369. MEBA argues that it did not breach a duty of fair representation or act arbitrarily by treating Chief Stewards and Masters differently because they had good reasons for agreeing to the side letter.

### a. The 2013 side letter agreement

Jones argues that MEBA should have never agreed to the 2013 side letter or the exception from just cause termination for Chief Stewards. Jones argues that by entering that agreement MEBA acted arbitrarily, discriminately, or in bad faith.

Although Jones concedes that she was a supervisor, she argues that Chief Stewards are not "managers" and should not have been treated as such by MEBA. (ECF No. 169, PageID.1504-1505.) Jones argues that even if Chief Stewards were considered "managers", they should have been treated no differently from how Chief Engineers were treated under the CBA. (ECF No. 169, PageID.1505, 1517.) Jones says that MEBA could have gone on strike to have Chief Stewards protected from no-cause termination. Further, Jones argues that since she paid full union dues with no discount offered, she should have been entitled to full union protection.

In the opinion of the undersigned, MEBA has set forth good reasons why Jones's arguments fail and why they agreed to Interlake's demand that Chief Stewards and Masters should be excluded from just cause termination. First, Chief

10

Stewards and Masters were the heads of their respective departments. Even Jones concedes she was a supervisor. (ECF No. 169, PageID.1504-1505.) Second, MEBA did not maintain a roster of stewards, unlike engineers, that could be referred to Interlake. Instead, Interlake hired and trained stewards. Third, Interlake did not want an arbitrator to second-guess a decision to terminate a Chief Steward, because Chief Stewards prepared and provided the food that affected morale on the ship. (*See* ECF No. 167-10, PageID.1472 (former MEBA President Michael Jewell's attestation that "Interlake asserted that the number one factor that affects morale on a ship is the food and, correspondingly, the Chief Steward, who is responsible for the food").) In other words, Interlake was not budging on the position of excluding Chief Stewards from just cause termination.

Importantly, despite Jones's assertion otherwise, MEBA had little bargaining power because the bargaining unit was comprised of supervisors (ECF No. 32-1, PageID.139)[4] and Interlake could insist on excluding Chief Stewards and Masters from just cause termination without violating labor laws. Section 14(a) of The National Labor Relations Act ("NLRA") provides:

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem

---

[4]  The 2013 CBA states: "The Parties agree that all of the Officers to whom this Agreement is applicable are "supervisors" within the meaning of the Labor Management Relations Act of 1947, as amended. (ECF No. 32-1, PageID.139.) The 2013 side letter states" "It is agreed that the Company will employ a Master and a Chief Steward (Officers) on all vessels covered by the August 1, 2013, Collective Bargaining Agreement (Agreement) simultaneously executed herewith, between the Parties." (ECF No. 32-2, PageID.178.)

>individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a).[5]  Under § 14(a) of the NLRA, Interlake did not have to bargain with supervisors or allow them to remain in the bargaining unit. *Beasely v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 654-57 (1974). It was solely within Interlake's discretion to choose to do so. *Florida Power & Light v. Elec. Workers,* 417 U.S. 790, 807-08 (1974).

Despite Interlake's insistence that it retain the ability to terminate Masters and Chief Stewards at-will, MEBA nevertheless convinced Interlake to accord some of the benefits of the CBA to these individuals. By convincing Interlake to agree to have Masters and Chief Stewards in the bargaining unit, MEBA was able to secure fringe benefits for Masters and Chief Stewards as set forth above in the side letter agreement.

Jones argues that MEBA should never have agreed to allow Interlake to treat Chief Stewards any differently from how Chief Engineers, also supervisors, were treated in the negotiated 2013 CBA. But Interlake never sought to exempt Chief Engineers from the provisions of the CBA, despite their head-of-department status, so MEBA never brought that up in the negotiations. (ECF No. 167-6, PageID.1453 (Affidavit of Robert Dorn); ECF No. 167-8, PageID.1461 (Affidavit of Ronald Davis).)

---

[5]  The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.  29 U.S.C. § 152(11)

The fact that Chief Engineers were treated differently from Chief Stewards in the CBA does not mean that MEBA acted unreasonably in negotiating the side letter agreement. As the Supreme Court explained, there is a wide range of reasonableness when construing how the negotiated agreement affects different classes of employees.

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Ford Motor Co.*, 345 U.S. at 338.

Engineers made up most of MEBA's membership. (ECF No. 167-6, PageID.1453 (Affidavit of Robert Dorn); (ECF No. 167-10, PageID.1472 (Affidavit of Michael Jewell).) MEBA had a roster of engineers and referred them to Interlake, but MEBA did not have a roster of stewards, or refer stewards to Interlake. (ECF No. 167-10, PageID.1472.) MEBA trained and referred Chief Engineers to Interlake. (*Id.*) In the opinion of the undersigned, it was reasonable for MEBA to agree to treat Chief Stewards differently from Chief Engineers under the CBA; more importantly, MEBA's acceptance of the side letter agreement was not irrational, arbitrary, discriminatory, or in bad faith.

Jones argues that instead of agreeing to the side letter, MEBA should have gone on strike until Interlake agreed to give Chief Stewards full protection under the

CBA. MEBA counters by stating that that they could not just declare a strike, because the membership's majority must vote to go on strike.

Jones's argument that MEBA's failure to go on strike to secure her full protection under the CBA does not make the negotiation of the side letter arbitrary, discriminatory, or in bad faith. In the opinion of the undersigned, MEBA did not act arbitrarily, discriminately, or in bad faith by failing to declare a strike. The Court must consider the negotiation posture between Interlake and MEBA and what MEBA was attempting to accomplish based on Interlake's position regarding Chief Stewards and Masters. *Air Line Pilots Ass'n., Intern*, 499 U.S. at 79. This was explained in the affidavits attached to MEBA's motion. For example, Ronald Davis, who represented MEBA during the 2003 negotiations, stated that Interlake's initial position was that Chief Stewards and Masters should be at-will employees and excluded from coverage under the CBA. (ECF No. 167-8, PageID.1460 (Affidavit of Ronald Davis).) Davis explained:

> 5. Regarding Chief Stewards, we wanted them to be included in the bargaining unit because they were in the AMO bargaining unit and they could not be in the seamen bargaining unit that was represented by Steelworkers Local 5000 because Chief Stewards supervised members of that bargaining unit. It would have been incongruous for one position on the vessel to be unrepresented; since all other positions were either in the MEBA-D1 bargaining unit or the Steelworkers Local 5000 unit. We also wanted Chief Stewards to be covered by all provisions in the CBA. Interlake, however, argued that if Chief Stewards were in the bargaining unit, they should be excluded from coverage of certain CBA provisions, such as just cause and training. Interlake provided two reasons for this. First, as mentioned above, Chief Stewards were in charge of their department. Second, unlike AMO, which had stewards among its members, MEBA-D1 did not have stewards as members. Furthermore, AMO had training available for stewards while MEBA-D1 did not. So, MEBA-D1 could not refer trained

14

>stewards when there were openings. This meant that Interlake would have to hire and train their own Chief Stewards. Interlake argued, therefore, that since they would have to hire and train them, they should be able to terminate their employment without facing a grievance.
>
>6. The parties reached a compromise where Masters and Chief Stewards would be in the bargaining unit, but would not be covered by certain provisions of the CBA, such as the requirement that Interlake have cause for termination without the terminated Master or Chief Steward having the right to grieve any termination. We felt this was a reasonable compromise, as did the Masters and Chief Stewards at the time, because it would make them eligible for lucrative benefits, especially pension—benefits they would not be eligible for it entirely excluded from the bargaining unit.

(*Id.*, PageID.1460-1461.)

This same logic applied to the terms of the CBA and side letter in 2013. ((ECF No. 167-10, PageID.1471-1472 (Affidavit of Michael Jewell).) MEBA's agreement to the terms of 2013 side letter was reasonable under the circumstances. Interlake had a strong opinion regarding its need to be able to terminate Masters and Chief Stewards at-will. Nothing in the record contradicts this point. In light of that position, MEBA negotiated a reasonable deal for its members – including Masters and Chief Stewards. In the opinion of the undersigned, Jones has failed to show that MEBA acted arbitrarily, discriminately, or in bad faith in agreeing to the 2013 side letter.

Additionally, Jones argues that MEBA required her to pay full union dues so she should have received the same protections as any other union member under the CBA. The Sixth Circuit raised this issue in its reversal of this Court's dismissal of the claims against MEBA: "Without any other information, we cannot make any inferences as to MEBA's justification for creating these distinctions among union

15

members, especially when those members appear to pay the same dues." (ECF No. 67, PageID.510.) First, as explained above, MEBA did not act arbitrarily, discriminately, or in bad faith by agreeing to the 2013 side letter which carved out an exception for just cause termination for Chief Stewards, and MEBA has set forth good reasons for agreeing to the 2013 side letter. Second, during the time Jones worked for Interlake, she worked only in Wisconsin, Michigan, and Indiana. Wisconsin, Michigan, and Indiana had right-to-work laws.[6] Under the right-to-work laws, Jones was not required to pay union dues. *See, United Auto., Aerospace, & Ag. Implement Workers of America Local 3047 v. Hardin Cnty.*, 842 F.3d 407, 411 (6th Cir. 2016) (explaining that §14(b) of the NLRA allows States to exempt workers from the union policy requiring employees to pay union dues whether or not they stay members of the union).

### b. MEBA's post-termination investigation

As set forth above, Jones was exempt from just cause termination and she had no contractual right to the grievance process. There was little that MEBA could do on Jones's behalf since Interlake could terminate her without cause. "Accordingly, Interlake did not breach any contractual obligations to Jones by firing her, even if it may have lacked just cause to do so." (ECF No. 67, PageID.507 (Sixth Circuit Decision).)

---

[6]   Wis. Stat. § 111.04(3) (eff. 3/11/15), Mich. Comp. Laws § 423.14(1) (eff. 3/28/13, repealed), Ind. Code § 22-6-6-8 (eff. 2/1/12).

Nevertheless, Jones argues that MEBA failed to conduct a proper investigation of her termination from Interlake and failed to file a grievance on her behalf. In the opinion vacating this Court's decision, the Sixth Circuit recognized that Jones alleged and argued that MEBA acted in bad faith due to (1) procedural deficiencies in handling her grievance, and (2) by giving her conflicting information as to whether the grievance procedures applied and whether she missed internal deadlines. (ECF No. 67, PageID.511 (Sixth Circuit decision).)

Jones argues that MEBA failed to recognize she "undertook an impressive 400-mile drive alone through the night to try to catch the ship at the Soo Locks, its next port, which is also where she lived", failed to take into account that she asked for a phone call before the ship left, relied on food complaints despite her promotion[7], and included her personal life in the investigation.[8] (*Id.*, PageID.1520.)

A union is not absolutely required to file a grievance on behalf of an employee. *Vaca*, 386 U.S. at 191. A union must "act in good faith and in a nonarbitrary manner" in deciding whether to pursue a grievance. *Id.*, at 194. "Mere negligence

---

[7] Captain Gregory Sipper had documented several issues in "a list of concerns about Krista Jones" that included not working full 8 hour days, not having meals ready in the galley as staff finished shifts, improperly storing food, displeasure by the crew in the meals prepared, not being a good leader, acting disrespectful, failing to get along with a second cook and treating them poorly, implementing her own self-made rules, failing to get approval from superiors before making decisions that were outside her authority, and blaming others for her shortcomings. (ECF No. 167-4, PageID.1445-1446.)

[8] Jones also asserts that MEBA erred in the investigation by not recognizing she paid full union dues despite the side letter agreement and by failing to recognize that Interlake would have the burden of proof in a grievance proceeding.

. . . . ordinary mistakes, errors, or flaws in judgment" are insufficient to show that a union took arbitrary action in handing a grievance. *Garrison*, 334 F.3d at 538. Rather, a plaintiff must show that a union's behavior was irrational and outside the wide range of reasonableness. *Id.*, citing *Air Line Pilots Ass'n., Intern*, 499 U.S. at 67.

The reasons that MEBA decided not to pursue an appeal of Jones's termination with Interlake were set forth in a letter dated August 30, 2019. The letter stated:

> The DEC is in receipt of your appeal concerning your termination of employment from Interlake Steamship Company. An investigation was undertaken by the Union on your behalf in order to determine if the firing was justified. Based upon documentation provided and first hand interviews, the Union has determined that:
>
> 1. You were counseled by the Company prior to your last return to the vessel concerning your poor performance.
>
> 2. Shortly thereafter you ignored the posted sailing board, went ashore and subsequently missed the ship.
>
> 3. You were in contact with Jayson Toth of Interlake who gave you clear instructions to check into a hotel that was direct billed to the company. You ignored Mr. Toth's instructions and apparently went home instead.
>
> 4. You reached out to several M.E.B.A. Union officials, Tracy Burke, Mark Gallagher and Jason Callahan after you had been terminated. Whereupon you were directed to fill out a grievance form from the Union website, to cite the reasons and provide any supporting documentation as to why you believe you were unjustly terminated.
>
> 5. The Union has no record of any grievance filed on your behalf other than the document sent 8-17-19 to M.E.B.A. President M. Ainley dated May 31, 2019. If you have any proof that you submitted this grievance to any Union official prior to that date, please provide documentation.
>
> 6. Finally, while we did look for some issue to move forward with this grievance, due to a side letter to the CBA (attached) we technically cannot grieve your termination with the company as the side letter specifically states that for Captains and Chief Stewards *"Article VI Grievance Procedure shall apply only to alleged violations of VIII Family Leave Vacation Benefits, X Sailing Season Bonus, XI Transportation, XIII Continuity of Service, and XVI MEBA Benefit Plans."* Unfortunately, this grievance was beyond the scope of these limitations and did not deviate enough from the normal steps of termination to be able to move forward.
>
> For the reasons above, the DEC has denied your appeal for your termination with Interlake steamship company.
>
> Regards,
>
> M.E.B.A. District Executive Committee

(ECF No. 32-3, PageID.180.) Jones fails to address these reasons in any meaningful way. Instead, she simply argues that there were other reasons that MEBA chose not to file a grievance on her behalf.

In the opinion of the undersigned, MEBA's stated reasons for not proceeding on her behalf are neither irrational nor outside the wide range of reasonableness. MEBA investigated Jones's termination with full knowledge that she could not engage in the grievance process. (ECF No. 167-1, PageID.1364 (Jason Callahan deposition).) Although, Jones finds fault with the investigation, MEBA's agent Jason Callahan wanted "to make sure the accurate story was being told . . . to make sure the company didn't have just the wrong idea" and "to make sure that the member was afforded all due process, and all available rights to save their employment. (*Id.*, PageID.1364-1365.) MEBA went beyond what they were contractually obligated to do. MEBA has shown that there exists no genuine issue of material fact on the issue of whether they failed to act in good faith or arbitrarily during the investigation into whether they could pursue any remedies on Jones's behalf including the filing of a grievance.

## V. Recommendation

It is respectfully recommended that the Court grant MEBA's motion for summary judgment and dismiss this case.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C);

Fed. R. Civ. P. 72(b); W.D. Mich. Live 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:   April 2, 2024                               /s/ *Maarten Vermaat*
                                              MAARTEN VERMAAT
                                              U.S. MAGISTRATE JUDGE